UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RAYMOND SCOTT, )<br> Plaintiff, ) | Civil Action No. 01-10323-NG |

RAYMOND SCOTT,                        )
    Plaintiff,                   ) Civil Action No. 01-10323-NG
                                   )
    v.                             )
                                   )
MACY'S EAST, INC., KENNETH            )
SANABRIA, KIMBERLY JONES, JOHN        )
OUELLETTE, RUSSELL JENKINS, and       )
the TOWN OF BRAINTREE,                )
    Defendants.                  )

GERTNER, D.J.:

**MEMORANDUM AND ORDER**
October 31, 2002

## I.    INTRODUCTION

For their role in a credit card fraud investigation that
culminated in Plaintiff Raymond Scott's confrontation with police
at a shopping mall, Scott brings numerous causes of action.
Scott sues Defendants Macy's East, Kenneth Sanabria, and Kimberly
Jones (the "Macy's Defendants") and the Town of Braintree, John
Ouellette, and Russell Jenkins (the "Braintree Defendants").
Against the Macy's Defendants he alleges violations of 42 U.S.C.
§§ 1981 and 1982; violations of state and federal public
accommodations laws; violation of the Massachusetts Civil Rights
Act ("MCRA"); unfair trade practices in violation of the
Massachusetts General Laws, Chapter 93A; and state common law
torts of false imprisonment, slander, negligence, and intentional
infliction of emotional distress.  Against the Braintree

DOCKETED

52

Defendants, Scott alleges state and federal civil rights violations.

At its core, this case involves an allegation of racial profiling. Scott believes -- and he may well be correct -- that race played a role in his treatment at the South Shore Mall on June 29, 1999.[1] The law, as I describe below, requires some measure of proof, and in a civil case, it is the claimant who bears the burden of proof. When the word of one party runs up against the word of another, as here, it is not the law's place to comment as to whose word means more. The defaults are set to favor the defendant, black or white. While Scott may have made out his claim if he (or his counsel) had conducted a meaningful investigation, where he has not, summary judgment will lie.

Both the Macy's Defendants [docket entry #26] and the Braintree Defendants [docket entry #29] move for summary judgment

---

[1] Commentators have suggested that the power of racial assumption is often irresistible -- that, to some extent, improper attendance to race unconsciously infiltrates the sort of judgment calls that Sanabria and Jones must make in the course of their employment. Miriam Kim, Discrimination in the Wen Ho Lee Case: Reinterpreting the Intent Requirement in Constitutional and Statutory Race Discrimination Cases, 9 Asian L. J. 117, 139-40 (2002) (reviewing psychological studies of unconscious stereotyping through cognitive short-cutting); Ian F. Haney-Lopez, Institutional Racism: Judicial Conduct and a New Theory of Racial Discrimination, 109 Yale L. J. 1717, 1769 (2000) (referencing the "large class of cases in which persons engage in discrimination but do not understand themselves to be discriminating" to challenge intentional discrimination models).

on all claims.  For the reasons set forth below, I **GRANT** both
motions.

## II.  <u>FACTS</u>

The unfortunate incidents giving rise to this case occurred
on June 29, 1999, in the South Shore Plaza shopping mall in
Braintree, Massachusetts.  On the evening of June 29, Plaintiff
Raymond Scott, an African-American man, visited Defendant Macy's
East, Inc.'s department store at the South Shore Plaza mall with
a friend, Trevor Watson.  Defendants Kenneth Sanabria and
Kimberly Jones were working in the Macy's store that evening in
their capacity as "security associates."  It is the task of
security associates to wander the floors in plain clothes and
keep their eyes open for shoplifters.

On his way to the store's security office, Defendant
Sanabria first noticed Scott and Watson shopping in the
"collections" area of Macy's men's department, where designer
clothes from such popular names as Ralph Lauren and Tommy
Hilfiger adorn the racks.  Scott and Watson were gathering stacks
of clothes to purchase, seemingly without much attention to the
price or size of individual items.  It is the Macy's Defendants'
position that Scott and Watson were shopping "rapidly"; Scott
disputes this characterization, pointing to his own deposition

-3-

testimony that when he goes to the store, "I go in and know what I want and get it and leave." Sanabria proceeded to the security office and encountered Defendant Jones. As the two stopped to talk, they observed Scott passing by with an armload of merchandise.

Sanabria and Jones testified at deposition that they were trained to identify shopping behaviors consistent with the use of stolen credit cards. Moreover, it is Macy's practice to give its security associates anti-discrimination training, in an effort to ensure that its employees focus on the behavior -- and not the race -- of shoppers as they scan the floors for suspicious activity. It was Sanabria and Jones's conclusion that Scott and Watson's behavior merited more attention. Accordingly, Jones returned to the security office, where she could monitor the two shoppers' activity via security camera.[2]

While in the security office, Jones received a call from "Amy," a saleswoman in the men's department. Amy was concerned

---

[2] According to Jones's deposition, she and Sanabria both personally saw the behavior deemed suspect, discussed it, and went their separate ways -- Jones to the security office and Sanabria upstairs to the jewelry department. Sanabria's deposition makes no mention of any encounter with Jones: as he tells it, he spotted Scott and Watson, noted their behavior, stopped by the security office and returned upstairs. Though the stories are not contradictory -- Sanabria may well have omitted the detail of his encounter with Jones -- the plaintiff views the two stories as sufficiently in conflict as to render "the credibility of Jones and/or Sanabria highly questionable." I do not agree. In any case, my findings on summary judgment do not depend on Jones or Sanabria's credibility.

about two men in the department who were making repeated trips to the sales counter to add to a pile of clothes they wanted to purchase. Jones continued to follow Scott and Watson on her monitors and Scott and Watson continued to heap clothes on the sales counter, without much attention to size or price. Jones called Sanabria back down to the security office and reported Amy's observations to him.

Scott ultimately purchased seventeen items in the men's department, charging the items to an American Express Gold Card referencing a corporate account for The Source. The Source is a hip-hop magazine of national circulation, founded and owned in part by Scott. Scott's name was on the credit card. American Express approved a charge of around $750.00. Scott and Watson then left the department with their purchases, whereupon Sanabria and Jones approached Amy and asked after the number of the credit card Scott had used.

Scott and Watson went on to purchase $180.00 in cologne and a $500.00 gift certificate at the fragrance counter. At the fragrance counter, as Jones watched from a distance, Scott and Watson began to divide their purchases into separate bags. Jones viewed this practice, like the rapid, apparently indiscriminate selection of clothing items, to be consistent with the use of a stolen credit card. At no time did Sanabria, Jones, or any other

-5-

Macy's employee confront Scott and Watson about their behavior, though Jones did follow them out into the mall concourse. Scott made further purchases with the American Express card at Champs, a sporting goods store.

Sanabria called American Express's fraud hotline to report what he and Jones had seen.[3] The basis for this decision, according to the testimony of Sanabria and Jones, was that Scott and Watson were purchasing clothing indiscriminately and in large amounts, that they did so rapidly and in several trips to the sales counters, that the two shoppers charged large amounts to a single credit card, and that they divided their items into separate bags. Sanabria and Jones testified at deposition that the plaintiff's race did not factor into their decision.

After Sanabria read off the credit card number, American Express put Sanabria on hold and tried to contact the named cardholder: Raymond Scott. The attempt was unsuccessful -- as Scott was still at the mall -- and American Express placed a "temporary freeze" on the account. A decision was made to call the Braintree Police Department. Shortly thereafter, Defendant police lieutenant Russell Jenkins and Defendant patrolman John

---

[3] In his deposition Sanabria says he dialed up American Express after Scott and Watson left the fragrance counter and Sanabria consulted with the saleswoman. Jones testified that Sanabria made the call while Scott and Watson were still at the counter.

Ouellette arrived at the mall to discuss the matter with Sanabria.

At Lady Foot Locker, another store in the mall, Scott proffered the American Express card once more. By now the temporary freeze was in place. The clerk at Lady Foot Locker received a message from American Express asking her to call them about the proposed use of Scott's card. The clerk complied, spoke briefly with American Express, and handed the telephone to Scott. The representative of American Express told Scott that Macy's had observed "two black men . . . fraudulently using the card." Scott responded that he and Watson were the black men and that the card was his. Scott was put on hold.

While Scott was on hold, another employee at Lady Foot Locker informed him that Defendants Ouellette and Jenkins had arrested Watson. Scott handed the phone to the sales clerk and left the store to ascertain what had happened.

The parties' depositions dispute what happened next, and no testimony was taken from third party witnesses. According to the Braintree Defendants, Scott approached them hurriedly and, as a crowd gathered, "yelled offensive, vulgar, and racially charged epithets" at Jenkins. Jenkins asked for Scott's identification and tried unsuccessfully to calm him down. Although he provided photo identification, Scott refused to show Jenkins his credit

card. Jenkins cautioned Scott about his loud, disruptive behavior and explained that persistence in this course of conduct would result in his arrest for disorderly conduct. Scott then challenged Jenkins to a fight. Jenkins informed Scott that he was under arrest, as promised, for disorderly conduct. Ouellette intervened and sprayed Scott twice with pepper spray before Scott ceased resisting arrest and submitted to handcuffs. Ouellette and Jenkins had to drag Scott from the scene.

Scott's version of his interaction with the police differs considerably. According to Scott, he approached the police at a regular, nonthreatening pace and never resorted to vulgar or abusive language while they were questioning him. When asked to produce ID, he suggested to the police that the inquiry was the result of racial profiling. Scott then asserted his rights, told Jenkins "that he was violating me, that it was embarrassing." Scott then refused to be quiet, refused to submit to arrest, "[a]nd basically the next thing Officer Ouellette maces me and they tackled me to the ground, started punching me, macing me again when I was on the ground, then dragged me out on my knees out of the mall." At this point, "when they was macing and beating . . . me," Scott may have used foul language.

However, notwithstanding Scott's characterization of the facts in this litigation, he pleaded guilty to resisting arrest

and admitted to sufficient facts on the charges of disorderly conduct and assault and battery of a police officer. (The case was then continued without a finding.) Ouellette and Jenkins were tried and acquitted of criminal charges of excessive force.

## III. **DISCUSSION**

Under Federal Rule 56, summary judgment appropriately disposes of a claim when the pleadings, depositions, interrogatory responses, admissions and affidavits on file suggest that there is no genuine issue of material fact and the movant is entitled to judgment on the claim as a matter of law. Fed. R. Civ. P. 56(c). It is incumbent upon a court confronted with a summary judgment motion to view the facts in the light most favorable to the nonmovant, and all reasonable inferences from these facts are to be drawn in its favor. Thomas v. Eastman Kodak Co., 183 F.3d 38, 42 (1st Cir. 1999), cert. denied, 528 U.S. 1161 (2000).

### A. **42 U.S.C. § 1981**

In pertinent part, 42 U.S.C. § 1981 recognizes the same right of all persons "to make and enforce contracts . . . as is enjoyed by white citizens." Suit is available against private actors under both statutes, Patterson v. McLean Credit Union, 491 U.S. 164, 177 (1989), but to support a cause of action,

discrimination must be race-based and intentional.  Dartmouth
Review, 889 F.2d at 17.  It is therefore Scott's burden to show
that the Macy's Defendants interfered with his right to make
contracts because of his race.

### 1.  Is a § 1981 Right to Contract Involved?

A threshold question, raised by defendants, is whether a §
1981 right to contract is involved at all.  In Garrett v. Tandy,
Inc., 295 F.3d 94 (1st Cir. 2002), the court found that
plaintiff's right to contract was not involved in facts similar
to, but not identical to those at issue here.  Radio Shack
employees followed a black shopper around the store,
"monitor[ing] his movements."  Id. at 96.  Upon learning, after
the plaintiff's departure, that merchandise was missing, the
store falsely accused the plaintiff of theft.  Id.  The Garrett
court rejected the plaintiff's § 1981 claim, adopting a position
of strict adherence to the statute's language: the statute
requires a per se interference with the plaintiff's ability to
contract.  Id. at 100.

While under Garrett, the Macy's Defendants' surveillance of
Scott does not implicate § 1981, their role in deactivating
Scott's American Express card does.  For a time, Scott was denied
the ability to contract with American Express (and arguably Lady

-10-

Foot Locker as well, though he might have paid for his purchases in cash).

The Macy's Defendants have an answer for this as well: they point to a case in the Southern District of New York with facts almost identical to those before this Court.  In <u>Nevin v. Citibank N.A.</u>, 107 F. Supp. 2d 333 (S.D.N.Y. 2000), security officers at the Lord & Taylor department store in New York took note of an African-American shopper's high-volume credit-card purchases and tipped off the credit card company and police.  <u>Id.</u> at 337-38.  The credit card company refused subsequent charges at another store and, while on the telephone with the clerk, asked to speak to the cardholder plaintiff.  <u>Id.</u> at 349.  The plaintiff never spoke to the company to settle the question.  <u>Id.</u>  The <u>Nevin</u> court therefore concluded that "Nevin was the cause of her own distress," <u>id.</u>, and dismissed the claim.

Following <u>Nevin</u>, the Macy's Defendants' view -- that Scott's snap decision to forestall resolution of his credit card freeze to attend to his friend's arrest extinguishes his § 1981 claim -- is analogous to an argument of contributory negligence.  The analogy is misplaced.  A § 1981 violation complete with racial discrimination is more akin to an intentional tort, for which contributory negligence is not a defense, <u>Restatement (Second) of Torts</u> § 481, than an act of negligence.  Moreover, the direct

-11-

consequence of Macy's Defendants' action was an impairment of

Scott's ability to make and enforce contracts.  Scott's failure

to correct the situation at the first opportunity contributed to

the duration of the impairment, but not the impairment itself.  I

therefore reject the Nevin court's analysis on that score.

## 2.  **Is There Evidence of Race Discrimination?**

The more serious impediment to recovery concerns proof of

racial discrimination.  See Alexis v. McDonald's Restaurants of

Massachusetts, Inc., 67 F.3d 341, 347-48 (1st Cir. 1995) ("As

Alexis points to no competent evidence that Domina and McDonald's

intentionally discriminated against her on account of her race,

the district court correctly ruled that this section 1981 claim

was not trialworthy").  It is important to say at the outset that

here, as in other discrimination cases, Scott does not have to

come forward with direct evidence of racial discrimination.

Courts have taken due notice of the fact that a plaintiff can

rarely uncover specific statements or documentary evidence

indicating racism.  As a consequence, though claims brought under

the Equal Protection Clause of the Fourteenth Amendment, for

example, require proof of discriminatory intent, a plaintiff may

prove that intent with circumstantial evidence.  Judge v. City of

Lowell, 160 F.3d 67, 77 (1st Cir. 1998).  The conclusion of

discrimination must have "specific, nonconclusory factual"

support, however.  Id. at 75.  A plaintiff must summon evidence
from which racial discrimination might be inferred.

Here, for example, Scott might have conducted discovery of
Macy's past conduct.  Documentary or testimonial evidence might
have revealed prior complaints of discrimination or a pattern of
activity suggesting that minority shoppers caught the eye of
security officials more than white shoppers did.  Village of
Arlington Heights v. Metropolitan Housing Development Corp., 429
U.S. 252, 266-67 (1977) (finding such evidence probative of
discrimination).  Comparing the treatment Scott received from the
Macy's Defendants on this occasion with the treatment accorded to
white shoppers behaving similarly might alone support an
inference of discrimination.  Garrett v. Tandy, Inc., 295 F.3d
94, 108 (1st Cir. 2002) (Boudin, J., concurring in part and
dissenting in part) ("And, if Garrett's behavior was no different
than that of other shoppers who visited Radio Shack at the same
time (save as to his race), and if he alone was identified to the
police, an inference of racial discrimination is more than
speculation.").

Quite apart from pattern and practice and evidence, Scott
could have buttressed his claim in the instant case with the
testimony of third party witnesses who observed him shopping.  Or
he could have submitted credit card receipts, which are usually

-13-

time-stamped, to refute the Macy's Defendants' allegations that he was shopping so fast as to raise suspicions of credit card fraud.

The plaintiff has explored none of these avenues to circumstantial proof of discrimination. Instead, the sum total of evidence offered by Scott in support of his allegations of racial discrimination is (1) Scott's own conviction that he was a victim of racial profiling, and (2) the American Express representative's statement to Scott -- inadmissible, as I describe below -- that a Macy's employee had reported that "two black men were fraudulently using the card." Scott's instincts, whether or not they are rationally based or reflect the reality of his treatment at Macy's, cannot alone support a legal conclusion of discrimination. See Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989) ("[M]erely juxtaposing the fact of one's race with an instance of discrimination is insufficient to state a claim.").

All the plaintiff can muster to corroborate his view is the American Express representative's statement, which he offers as evidence that Sanabria and Jones keyed on Scott's race. Sanabria and Jones deny that the statement was made. No one from American Express has been offered to testify to the statement. Rather, plaintiff says that this is what one American Express

-14-

representative said to him about what Sanabria said to another operator. The statement is inadmissible hearsay. I may not consider it on summary judgment. <u>Weston-Smith v. Cooley Dickinson Hospital, Inc.</u>, 153 F. Supp. 2d 62, 69 (D. Mass. 2001); <u>see also</u> <u>Pakizegi v. First Nat. Bank of Boston</u>, 831 F. Supp. 901, 909 (D. Mass. 1993) (finding the statement of a bank manager, relayed to the plaintiff through her supervisor, inadmissible as evidence of discrimination on summary judgment).

Scott challenges the stories of Jones and Sanabria, but not in a meaningful way. He points out inconsistencies in the stories and suggests that they bear on the Macy's Defendants' credibility as witnesses. However, none of the disjuncts in testimony are material or dispositive here. And here again, Scott has failed to take steps that might meaningfully challenge the testimony. He has not challenged their testimony that their training as security officials led to their focusing on Scott. He has not, for example, sought to look at the training materials and compare his conduct with the standards articulated there.

In the final analysis, Scott bears the burden of production and proof in this case. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986) ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials <u>negating</u> the opponent's claim."

(emphasis added)). Scott has neither refuted the justifications of the Macy's Defendants nor produced affirmative evidence -- even circumstantial -- of racial discrimination. He has not met that burden.

One caveat here: I do not suggest that Scott was wrong to think that race played a role in his treatment at the South Shore Mall on June 29, 1999.[4] The law, however, requires some measure of proof, and in a civil case it is the claimant who bears the burden of proof. When the word of one party runs up against the word of another, it is not the law's place to comment as to whose word means more. The defaults are set to favor the defendant, black or white. While Scott may have made out his claim if he had dug further, where he has not, summary judgment will lie.

**B. 42 U.S.C. § 1982**

Section 1982 affords "[a]ll citizens of the United States . . . the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell,

---

[4] Commentators have suggested that the power of racial assumption is often irresistible -- that, to some extent, improper attendance to race unconsciously infiltrates the sort of judgment calls that Sanabria and Jones must make in the course of their employment. Miriam Kim, Discrimination in the Wen Ho Lee Case: Reinterpreting the Intent Requirement in Constitutional and Statutory Race Discrimination Cases, 9 Asian L. J. 117, 139-40 (2002) (reviewing psychological studies of unconscious stereotyping through cognitive short-cutting); Ian F. Haney-Lopez, Institutional Racism: Judicial Conduct and a New Theory of Racial Discrimination, 109 Yale L. J. 1717, 1769 (2000) (referencing the "large class of cases in which persons engage in discrimination but do not understand themselves to be discriminating" to challenge intentional discrimination models).

hold, and convey real and personal property." The assertable rights under § 1982 are closely tied to the language of the statute -- a claim is not viable unless there is interference with a plaintiff's ability to acquire, keep, or alienate property. Garrett v. Tandy, Inc., 295 F.3d 94, 103 (1st Cir. 2002) (applying to § 1982 the logic that governed its limited reading of § 1981).

The Macy's Defendants certainly did nothing in derogation of Scott's § 1983 rights while he was in the store. However, the steps taken afterward that resulted in the freeze on Scott's credit card are, to my mind, actionable upon a showing of racial discrimination. Again, however, the plaintiff's claim must fail, because the plaintiff has mustered no cognizable evidence that Scott's race at all factored into its analysis.

C. **Federal and State Public Accommodation Laws**

Federal law establishes Scott's entitlement to "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race [or] color . . . ." 42 U.S.C. § 2000a. Chapter 272, § 8 of the Massachusetts General Laws likewise forbids racial discrimination "relative to the admission of any person to, or his treatment in, any place of public accommodation." The

parties do not dispute that Macy's is a place of public accommodation as set out in both statutes.

The Macy's Defendants' first line of defense is that their distant surveillance and report of their findings to the police and American Express do not implicate either statute. They point out that at no point did Sanabria or Jones interfere with Scott's shopping at Macy's. Scott moved freely through the store and made his purchases without incident.

Nevin supports the view that Macy's "hands-off" approach was sufficient to warrant summary judgment against Scott -- at least under the federal law. Nevin, 107 F. Supp. 2d at 348 ("[T]he Lord & Taylor Defendants cannot be liable under [the public accommodations statute] because Plaintiff was at no time denied access to the store, service in the store, extension of credit while in the store or any other amenities that the store offers its customers.").

I respectfully disagree. A defendant should not be immunized from liability under the public accommodation laws merely because the consequences of racism befall the plaintiff after his visit. The drafters of the Civil Rights Act could not have intended to require the admittance of racial minorities to places of public accommodation, while still authorizing

proprietors to arrange for their unjustified arrest after they have come and gone.

Had Scott offered evidence that racial animus or racially tainted suspicions of credit fraud prompted the actions taken by the Macy's Defendants in this case, or shown the Macy's Defendants' claims to be pretextual, Scott's claims under state and federal public accommodations laws could have gone to the jury. But -- yet again -- the absence of that evidence makes this claim as untenable as the § 1981 claims. Id. at 349 (rejecting Ms. Nevin's public accommodation claim against her credit card company for her failure to demonstrate racial bias).

### D. **42 U.S.C. § 1983**

According to his complaint and opposition papers, Scott alleges that the Braintree Defendants violated his rights under the Equal Protection Clause of the Fourteenth Amendment and the Fourth and Fifth Amendments. The papers do little to elucidate the theories underlying these claimed violations. The lines that follow demonstrate my best attempt to fill in the gaps.

Defendants Ouellette and Jenkins claim qualified immunity, such that they are not liable under § 1983 if "a reasonable official could have believed [the] actions [at issue] were lawful in light of clearly established law." Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994) (quoting

McBride v. Taylor, 924 F.3d 386, 389 (1st Cir. 1991)) (internal quotation marks omitted). It is the Braintree Defendants' position that no constitutional violation occurred.

### 1. **Equal Protection**

To establish a violation of equal protection principles under the 14th Amendment, Scott must prove intentional discrimination, that the officers treated him differently than they would white citizens because of his race. See Washington v. Davis, 426 U.S. 229, 239 (1976) (finding evidence of discriminatory impact insufficient to make out a violation of the Equal Protection Clause). Again, as described above, since a plaintiff can rarely produce specific statements indicative of racism, a plaintiff may offer circumstantial evidence to meet the requirement, so long as the conclusion of discrimination must have "specific, nonconclusory factual" support. Judge, 160 F.3d at 77.

But Scott has provided no evidence of discriminatory animus against the Braintree Defendants. His submission is entirely directed at the Macy's Defendants. As to Ouellette and Jenkins, Scott claims only that "the precipitating events which gave rise to the government actors becoming involved were the product of racial profiling and the governmental agents continued the egregious conduct and magnified it." Even if the record before

me supported finding an issue of fact as to the alleged discrimination by the Macy's Defendants -- and it does not -- crucial to Scott's case is some showing that Ouellette or Jenkins intended discrimination. <u>E.g.</u>, <u>Cason Enters., Inc. v. Metropolitan Dade Cty.</u>, 20 F. Supp. 2d 1331, 1340 (S.D. Fla. 1998) (holding that "evidence of discrimination by others cannot be used to impute liability" to a defendant in a § 1983 Equal Protection claim) (citing <u>Boykin v. Blooomsburg Univ. of Penn.</u>, 893 F. Supp. 378, 394 (M.D. Pa. 1993) ("Liability . . . under § 1983 cannot be imposed vicariously.")). He has not made that showing. He has not suggested that white citizens who behaved as he, vis-a-vis, the Braintree Defendants, would have been treated differently. Nor has he meaningfully contested the officers' account of his behavior. <u>See</u> below. Accordingly, I find no basis to preserve Scott's Equal Protection claim against the Braintree Defendants.

## 2. **Fourth and Fifth Amendment**

An arrest is reasonable for Fourth Amendment purposes when made on probable cause that the arrestee has committed a crime; qualifiedly immune officials escape liability if their belief that probable cause existed was reasonable. <u>Hunter v. Bryant</u>, 502 U.S. 224, 228 (1991) (citing <u>Beck v. Ohio</u>, 379 U.S. 89, 91

(1964)). The crime for which Scott was brought into custody was disorderly conduct.

Scott and the Braintree Defendants offer materially different views of the events in the mall concourse leading to Scott's arrest.[5] Standing alone, the gap between the two stories would be sufficient to thwart the Braintree Defendants' bid for summary judgment. But Scott faces a significant hurdle: his own admission of facts sufficient to support the offenses of disorderly conduct and assault and battery of an officer. Hopkins v. Medeiros, 48 Mass. App. Ct. 600, 613 (2000) ("An admission to sufficient facts may be introduced against the defendant in a subsequently litigated civil suit arising out of the same incident on the theory that the proceeding was the functional equivalent of a guilty plea, with the same degree of finality." (quoting Flannery et al, Massachusetts Evidence § 3.51(b) (internal quotation marks omitted))). Scott may not evade summary judgment in this case with deposition testimony that contradicts his sworn admission of facts sufficient to establish the offense.[6] Colantuoni v. Alfred Calcagni & Sons,

_____

[5] Because it is undisputed that Scott approached the police in the mall concourse and initiated the discourse, no inquiry is necessary into the constitutionality of the "stop."

[6] Thus, while Scott is not formally estopped by his guilty plea from contesting the reasonableness of his arrest, he may not avoid summary judgment with his own admissions. Independent testimony of third party witnesses to his exchange with the Braintree police, for example, would give rise to a

-22-

Inc., 44 F.3d 1, 4-5 (1st Cir. 1994), cited in Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 806 ("The lower courts . . . have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.").

To be sure, a civil rights plaintiff's admission to sufficient facts to support the offense ultimately charged does not necessarily lead to the conclusion that, at an earlier point, namely the time of his arrest, officers had probable cause to believe that a violation occurred. Where, as here, the underlying charge concerns the circumstances of the arrest, where the officers were on the scene to witness the events now contested, and where plaintiff agreed to the officer's version of the events leading to Scott's arrest for disorderly conduct, the distinction is moot. Scott's allegation that the arrest accomplished a Fourth Amendment violation cannot stand.

Scott also identifies a Fifth Amendment violation in support of his § 1983 action. As best as this Court can ascertain from

---

genuine issue of material fact if it supported Scott's version of the events.

Scott's pleadings and opposition papers, Scott proposes a due process theory, arguing that excessive force was used by Officers Ouellette and Jenkins in arresting him. This claim is in fact properly brought under the Fourth Amendment. <u>Saucier v. Katz</u>, 533 U.S. 194, 204 (2001). As to the resort to pepper spray and efforts to subdue Scott physically, the plaintiff must show not only that such gestures were unlawful, but that the officers were unreasonable in deeming them lawful. <u>Id.</u> at 205. <u>Saucier</u> further points out that "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." <u>Id.</u> On this theory as well, then, the guilty plea and the admissions to sufficient facts mandate summary judgment to the Braintree Defendants.

### E. **Massachusetts Civil Rights Act (Mass. Gen. Laws c.12, §§ 11H, 11I**

Scott brings claims against both the Macy's and Braintree Defendants under the MCRA, Mass. Gen. Laws c.12 §§ 11H and 11I, which grants persons a cause of action for civil rights violations. The MCRA authorizes suits against private actors. <u>Bell v. Mazza</u>, 394 Mass. 176, 181-82 (1985). To make out a claim under the MCRA the plaintiff must show that "(1) [his] exercise or enjoyment of rights secured by the Constitution or laws of

either the United States or of the Commonwealth[] (2) ha[s] been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" Swanset Development Corp. v. City of Taunton, 423 Mass. 390, 395 (1999). Arrest and detention is "intrinsically coercive" for MCRA purposes. Sarvis v. Boston Safe Deposit and Trust Co., 47 Mass. App. Ct. 86, 92-93 (1999).

The Macy's Defendants find the third element lacking in this case: Neither Sanabria nor Jones interacted with Scott. There was no opportunity for threats, intimidation or coercion. Scott responds that Massachusetts law recognizes a "joint venture" theory by which the coercive acts of police may be imputed to private parties. Id. In Sarvis a bank called the Nantucket police to have tenants removed from premises subject to foreclosure, notwithstanding the tenants' right to a summary eviction proceeding. The bank acted "fully expecting that the plaintiffs would be arrested if the police saw them at the property." Id. at 92; see also id. at 93 ("The arrests were motivated, inferentially, by the defendants' desire to remove the plaintiffs from the property without having to observe their right to summary process.").

Though Sarvis' language seems to suggest that willfulness or intent might be a requirement of an MCRA violation, that is not

-25-

in fact the case. When "the natural effect of the defendant's action was to coerce [the plaintiff] in the exercise of his rights," a claim under the MCRA is viable. <u>Redgrave v. Boston Symphony Orchestra, Inc.</u>, 399 Mass. 93, 100 (1987) (citing <u>Batchelder v. Allied Stores Corp.</u>, 393 Mass. 819, 822-23 (1985)). This inquiry is analogous to the "foreseeability" causation standard in negligence actions.

Scott's arrest by the Braintree Defendants, though under a different charge (disorderly conduct) than the Macy's Defendants might have anticipated, was certainly a foreseeable result of Sanabria's overtures to the police. What thwarts Scott's MCRA claims against both the Macy's and Braintree Defendants, however, is the absence of any underlying civil rights violation. Having failed to establish that the Braintree Defendants' coercion accomplished, contributed to, or was directed at any unlawful end, the MCRA claims cannot stand.

### F.  <u>Chapter 93A</u>

Chapter 93A of the Massachusetts General Laws gives consumers a right of action for unfair or deceptive trade practices. Mass. Gen. Laws c.93A, §§ 2, 9. Racial harassment is an established unfair trade practice under Chapter 93A. <u>Ellis v. Safety Ins. Co.</u>, 41 Mass. App. Ct. 630, 640 (1996) ("Racial harassment in the course of doing business is conduct fairly

described as immoral, unethical, or oppressive for the purposes
of G.L. c.93A."). The Ellis court denied summary judgment to the
defendants because the plaintiffs had adequately countered the
defendants' motion "with verified allegations of racially
discriminatory words and deeds." Id. Scott's unsubstantiated
offerings do not satisfy this standard.[7]

### G. **Common Law Tort of False Imprisonment**

In Massachusetts "[f]alse imprisonment is the intentional,
unjustified confinement of a person, directly or indirectly, by
force or by threat, of which that person is conscious or by which
he or she is harmed." Nault v. United Parcel Servs., Inc., 2001
WL 417249, at *6 (Mass. Super. Ct. Feb. 27, 2001) (citing Ortiz
v. Hampden Cty., 16 Mass. App. Ct. 138, 140 (1983)). The burden
of proof falls on the defendant to show that the confinement was
justified by law. Shine v. Vega, 429 Mass. 456, 463 n.13 (1999).
"[I]f an act is done with the intent to confine another, and such
act is the legal cause of confinement to another, it is
immaterial whether the act directly or indirectly causes the
confinement." Sarvis, 47 Mass. App. Ct. at 98.

---

[7] In his opposition, Scott makes no independent argument in support of
his Chapter 93A claim. His position is instead that the claim under Chapter
93A is viable for the same reasons that his claims under the MCRA and public
accommodation laws should survive summary judgment. Rejection of those claims
as unsupported by any showing of racial animus eviscerates any theory of
racial harassment.

The basis for Scott's arrest was his alleged disorderly conduct, and not the credit card fraud that the Macy's Defendants suspected. The disorderly conduct at issue occurred (allegedly) in the presence of the Braintree Defendants. The behavior that precipitated the arrest occurred after the Macy's Defendants' involvement. Police made their own determination as to the appropriateness of an arrest on a ground independent from that raised by the Macy's Defendants.

Scott can point to no acts on the part of the Macy's Defendants that constitute the "legal cause" of his arrest. Neither Sanabria nor Jones so much as approached Scott and Watson. It was the Braintree police officers who stopped and ultimately detained him. Macy's relies on the <u>Nevin</u> court's dismissal of that plaintiff's false imprisonment claim on the ground that although Lord & Taylor's tipoff triggered the police investigation, subsequent actions by the police were not imputable to the store. <u>Nevin</u>, 107 F. Supp. 2d at 348.

The <u>Nevin</u> court's view jibes with the Supreme Judicial Court's ruling in <u>Kidder v. Whitney</u>, 336 Mass. 307 (1957), that liability in tort for a police officer's actions will attach to a third party only "where the misconduct of the police officer resulted from the orders given by a representative of the

defendant."[8]  Id. at 309.  The Macy's Defendants here neither misled nor gave orders to Defendants Ouellette and Jenkins. Their responsibility for Scott's detainment is sufficiently attenuated, in my view, as to preclude liability under the law.

### H.  Common Law Tort of Intentional Infliction of Emotional Distress

"[O]ne who, by extreme and outrageous conduct and without privilege, causes severe emotional distress to another is subject to liability for such extreme emotional distress even though no bodily harm may result."  Agis v. Howard Johnson Co., 371 Mass. 140, 144 (1976).  Conduct is extreme and outrageous when it transgresses "all possible bounds of decency" and is "utterly intolerable in a civilized community."  Agis, 371 Mass. at 145. The Macy's Defendants point to other rhetoric from the courts requiring a showing of a "high order of reckless ruthlessness or deliberate intolerance."  Conway v. Smerling, 37 Mass. App. Ct. 1, 8 (1994).

The Macy's Defendants conduct hardly rises to this level. See Thorpe v. Mutual of Omaha Ins. Co., 984 F.2d 541, 545-46 (1st Cir. 1993) (holding that an insurance company's resort to a

---

[8] It is worth noting that Kidder does not apply to liability under the MCRA, which, as we have seen, has fashioned a joint venture doctrine that can impute liability to private parties for a police officer's acts.  Indeed, Kidder itself, which predated the MCRA by a number of years, prudently and prophetically characterized this principle as "the general rule . . . in the absence of a statute."  Kidder, 336 Mass. at 309.

private investigator to verify the extent of a policyholder's disability was not extreme and outrageous). Just as Scott musters no evidence of substance to support his case for racial discrimination, his claim on this theory fails for want of a showing of bad faith generally.

Moreover, taking either story of the confrontation -- Scott's or the Braintree Defendants' -- at face value, it is hard to resist a finding that the acts of either the police or Scott himself broke off the chain of causation. The plaintiff does not point to any independent emotional distress caused purely by Macy's investigation. To the extent that they accede to the Braintree Defendants' view that Scott approached them in obvious agitation, there may be evidence of distress caused by Macy's. But I do not see how, barring the production of admissible evidence that the Macy's Defendants' suspicions were baseless, Scott expects to demonstrate anything close to "extreme and outrageous conduct" at trial.

According to Scott, this tort by its very nature presents issues -- including the kind and severity of the defendant's conduct and the distress suffered by the plaintiff -- best determined by the jury. Thorpe squarely opposes the plaintiff's view of this tort as a jury-intensive inquiry: the First Circuit affirmed the trial court's decision to direct a verdict for the

defendant on an intentional emotional distress claim.  Thorpe,
984 F.2d at 545-46.  Summary judgment must enter for the Macy's
Defendants on this claim.

### I.  **Common Law Tort of Negligence**

The Macy's Defendants vigorously dispute every inch of the
negligence analysis: duty, breach, causation, and damages.  See
Baker v. Fed. Kemper Life Assurance Co., 400 Mass. 850, 853
(1987).  Macy's strongest point is that it, through Sanabria and
Jones, breached no duty owed to Scott.  Scott responds that the
Macy's Defendants in fact breached statutory duties announced in
the MCRA and public accommodation laws.  This argument entrusts
Scott's negligence claim to the merits of its statutory claims,
and for that reason it must fail.

Scott's articulation of his negligence claim makes it
legally redundant: the claim is only supportable on a finding of
a statutory violation, which Scott has also pleaded.  For that
matter, a showing of a public accommodation law or MCRA violation
only establishes duty and breach.  Whereas the statutory claims
would be complete, Scott would have to go the extra mile to prove
causation and damages.[9]

---

[9] As I have already noted, causation is a thorny issue, as the Macy's
Defendants argue that the damage plaintiff cites -- Scott's macing and arrest,
violently accomplished -- was not the reasonably foreseeable result of Macy's
call to the police.  See Poskus v. Lombardo's of Randolph, Inc., 423 Mass.
637, 638-40 (1996) (finding that an intervening third party act of negligence
broke the chain of causation between the defendant's negligence and the

The negligence claim, as Scott theorizes it, rises and falls with his MCRA and public accommodation claims against the Macy's Defendants. It is not clear why the plaintiff advanced this theory, which subsumes the statutory causes of action but with additional elements of proof.

### J.   **Common Law Tort of Slander**

The Massachusetts slander tort imposes liability for a defendant's defamatory false statements to a third party. <u>Jones v. Taibbi</u>, 400 Mass. 786, 791-94 (1987). "An imputation of crime is defamatory per se." <u>Id.</u> at 792. The plaintiff claims two instances of slander: specifically, that the Macy's Defendants told American Express and the Braintree police that Scott was shopping with a stolen credit card.

The Macy's Defendants do not dispute that such statements were false or defamatory; rather, they hang their argument chiefly on the contention that the statements were never made. Citing the deposition testimony of Sanabria and Jones, they argue that Sanabria, in his phone calls to American Express and the police, reported only his observations and his suspicions about credit card fraud. These were truthful statements, as were those both Sanabria and Jones made to police on the scene.

---

plaintiff's damage). <u>But see</u> <u>Marra v. Botta Corp.</u>, 356 Mass. 569, 572 (1970) (holding that the intentional -- even criminal -- acts of third parties do not break the chain of causation if they are reasonably foreseeable).

Massachusetts law affirms that it is nonslanderous to relay truthful facts that leave the listener to reach his own conclusions as to unlawfulness. Dulgarian v. Stone, 420 Mass. 843, 851 (1995); see also Nevin, 107 F. Supp. 2d at 343 (noting that, under New York law, the truthful relation of facts in support of a mistaken suspicion of criminal conduct is not slanderous, but that statements of mistaken legal conclusions of criminality are slander per se).

Scott's case therefore turns on precisely what the Macy's Defendants told American Express and the Braintree Police. Scott relies on his own deposition testimony, specifically, his memory of his telephone conversation with the American Express representative. According to Scott, the representative explained that the Macy's Defendant had told American Express that "two black men were fraudulently using the card." But again, this report is inadmissible hearsay, and so an insufficient basis to create a triable issue of fact. Fitzgerald v. Town of Kingston, 13 F. Supp. 2d 119, 127 (D. Mass. 1998) (granting summary judgment to a defamation defendant when the plaintiff relied solely on a newspaper report of the alleged defamatory statement). Sanabria's testimony as to what he told American Express stands unrebutted.

Scott gives no evidence regarding the content and wording of the Macy's Defendants' reports to police. I am therefore required to accept the testimony of Sanabria and Jones that the reports were so delicately phrased as not to pass as slanderous. And even if Scott offered hard evidence of a slanderous statement here, a qualified privilege attaches to defamatory statements made to police about third parties for criminal investigations. Hutchinson v. New England Telephone & Telegraph Co., 350 Mass. 188, 191 (1966) ("Public policy demands that police investigations should not be thwarted by inability to obtain answers from persons who know the facts but fear civil actions."). The qualified privilege immunizes a speaker from liability for defamation barring a showing that the statements were made with knowledge of their falsity or reckless disregard for the truth. Id.; Mendez v. M.S. Walker, Inc., 26 Mass. App. Ct. 431, 433-34 (1988). The Macy's Defendants maintain that Sanabria and Jones scrupulously investigated the alleged credit card fraud (albeit from a distance) before referring the matter to the police, and the record bears that out.

IV.  **CONCLUSION**

The failure of proof compels me to **GRANT** the Macy's and
Braintree Defendants' motions and to enter judgment for the
defendants.


**SO ORDERED.**

**Dated: October 31, 2002**

NANCY GERTNER, U.S.D.J.